<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

CARL M. DIGIULIO,

               Plaintiff,

v.

NANCY A. BERRYHILL,

               Defendant.

Case No.:  2:17-cv-02119 (PAZ)

**OPINION**

**APPEARANCES:**

JAMES LANGTON
LANGTON & ALTER, ESQS.
1600 ST. GEORGES AVENUE
RAHWAY, NJ  07065
      On behalf of Plaintiff

ELIZABETH A. CORRITORE
SPECIAL ASSISTANT U.S. ATTORNEY
C/O SOCIAL SECURITY ADMINISTRATION
OFFICE OF GENERAL COUNSEL
P.O. BOX 41777
PHILADELPHIA, PA 19101
      On behalf of Defendant

**PAUL A. ZOSS, United States Magistrate Judge.**

      This matter comes before the Court pursuant to Section 205(g) of the Social Security Act,

as amended, 42 U.S.C. § 405(g), regarding the application of Plaintiff Carl M. Digiulio for

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (42 U.S.C. §§ 401,

et seq.).  Plaintiff appeals from the final decision of the Administrative Law Judge ("ALJ") denying

the application; Defendant, the Commissioner of Social Security ("the Commissioner"), opposes

Plaintiff's appeal.[1]  After careful consideration of the record, including the ALJ hearing transcripts, the ALJ's decision, and the pleadings and memoranda of the parties, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure and Local Civil Rule 9.1(f).  For the reasons set forth below, the Court affirms the Commissioner's decision that Plaintiff was not disabled.

## I.    PROCEDURAL HISTORY

On January 24, 2013, Plaintiff filed an application for DIB alleging an onset date of October 1, 2012.  (R. 153-55.)[2]  On May 2, 2013, the Commissioner determined that Plaintiff was not disabled and denied the application.  (R. 72-78.)  Plaintiff filed for reconsideration, and his application was again denied on February 19, 2014.  (R. 79-91.)  On September 21, 2015, an Administrative Law Judge held a hearing on Plaintiff's application; Plaintiff was represented by counsel at the hearing.  (R. 28-71.)  On October 28, 2015, the ALJ issued a decision again denying Plaintiff's application.  (R. 11-27.)  On January 30, 2017, the Appeals Council denied Plaintiff's appeal (R. 1-5), thereby affirming the ALJ's decision as the "final" decision of the Commissioner.

On March 30, 2017, Plaintiff timely filed this appeal pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  ECF No. 1.  On April 25, 2018, Plaintiff consented to have a U.S. Magistrate Judge conduct all further proceedings in the case to disposition pursuant to 28 U.S.C. § 636(c) and Rule

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security.  On March 6, 2018, the Government Accountability Office stated that, as of November 17, 2017, Ms. Berryhill's status violated the Federal Vacancies Reform Act, which limits the time a position can be filled by an acting official and "[t]herefore Ms. Berryhill was not authorized to continue serving using the title of Acting Commissioner[.]"  *Violation of the Time Limit Imposed by the Federal Vacancies Reform Act of 1988 Commissioner*, Social Security Administration, Government Accountability Office (Mar. 6, 2018).  However, Ms. Berryhill continues to functionally lead the Social Security Administration from her position of record as Deputy Commissioner of Operations.  Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is substituted as the defendant in this suit.

[2] "R." refers to the continuous pagination of the administrative record.  ECF No. 8.

73 of the Federal Rules of Civil Procedure.  ECF No. 15.[3]  The case was reassigned to the undersigned Magistrate Judge on June 27, 2018.

## II.    LEGAL STANDARD

### A.    Standard of Review

This Court has the authority to conduct a plenary review of legal issues decided by the ALJ in reviewing applications for DIB.  *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  In contrast, the Court reviews the ALJ's factual findings to determine if they are supported by substantial evidence.  *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000); *see also* 42 U.S.C. §§ 405(g) & 1383(c)(3).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotations omitted); *see K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309 (JLL), 2018 WL 1509091, at *4 (D.N.J. Mar. 27, 2018).  Thus, substantial evidence is "less than a preponderance of the evidence, but 'more than a mere scintilla.'"  *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009) (citations and quotations omitted); *see K.K.*, 2018 WL 1509091, at *4.

The substantial evidence standard is a deferential one, and the ALJ's decision cannot be set aside merely because the Court "acting de novo might have reached a different conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see*, *e.g.*, *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL

---

[3] Defendant has provided general consent to Magistrate Judge jurisdiction in cases seeking review of the Commissioner's decision.  *See* Standing Order In re: Social Security Pilot Project (D.N.J. Apr. 2, 2018).

1509091, at *4 ("'[T]he district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484 (RBK), 2016 WL 4212102, at *3 (D.N.J. Aug. 9, 2016). The Court has a duty to "review the evidence in its totality" and "take into account whatever in the record fairly detracts from its weight." *K.K.*, 2018 WL 1509091, at *4 (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted)); *see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (substantial evidence exists only "in relationship to all the other evidence in the record"). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see K.K.*, 2018 WL 1509091, at *4. The ALJ decision thus must be set aside if it "did not take into account the entire record or failed to resolve an evidentiary conflict." *Coleman*, 2016 WL 4212102 at *3 (citing *Schonewolf*, 972 F. Supp. at 284-85) (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978))).

Although the ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000));

*see K.K.*, 2018 WL 1509091, at *4.  The Court "need[s] from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected." *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121 ("Although the ALJ may weigh the credibility of the evidence, [s/]he must give some indication of the evidence which [s/]he rejects and [the] reason(s) for discounting such evidence.") (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999)).  "[T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." *Cotter*, 650 F.2d at 482.  Absent such articulation, the Court "cannot tell if significant probative evidence was not credited or simply ignored." *Id.* at 705.  As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight [s/]he has given to obviously probative exhibits, to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  Remand is appropriate if the record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or contradictory findings.  *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984)).  Remand is also appropriate if the ALJ's findings are not the product of a complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the record.  *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp.3d 512, 518 (D.N.J. 2016).  A decision to "award benefits should be made only when the administrative record of the case has been fully developed

and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221-22 (citation and quotation omitted); *see A.B.*, 166 F. Supp.3d at 518.  In assessing whether the record is fully developed to support an award of benefits, courts take a more liberal approach when the claimant has already faced long processing delays.  *See*, *e.g.*, *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000).  An award is "especially appropriate when "further administrative proceedings would simply prolong [Plaintiff's] waiting and delay his ultimate receipt of benefits."  *Podedworny*, 745 F.2d at 223; *see Schonewolf*, 972 F. Supp. at 290.

> ### B.   <u>Standard for Awarding Benefits</u>

Under the Social Security Act, an adult claimant (i.e., a person over the age of eighteen) is disabled and eligible for DIB based on an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  20 C.F.R. § 404.1505(a).  An impairment is "medically determinable" if it results from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques.  Thus, an impairment can be established by objective medical evidence from an acceptable medical source but cannot be established by a statement of symptoms, a diagnosis, or a medical opinion.  *Id*. § 404.1521.

The process for determining an adult's claim for DIB involves a five-step sequential inquiry.  20 C.F.R. § 404.1520(a)(4).[4]  The claimant bears the burden of proof at Steps One through Four.  At Step Five, the burden shifts to the Commissioner.  *Id*. § 404.1512; *see Holley v. Colvin*,

---

[4] This case arises from a claim filed before March 27, 2017 and is therefore analyzed by this Court – as it was by the ALJ – under 20 C.F.R. § 404.1527.

975 F. Supp.2d 467, 476-77 (D.N.J. 2013), *aff'd sub nom. Holley v. Comm'r of Soc. Sec.*, 590 F. App'x 167 (3d Cir. 2014).  At each Step, the ALJ must consider the combined effect of all of the claimant's physical and mental impairments without regard to whether any single impairment, if considered separately, would be of sufficient severity to proceed to the next Step.  20 C.F.R. § 404.1523(c).

At Step One, the ALJ decides whether the claimant is currently engaging in substantial gainful activity.  20 C.F.R. § 404.1520(b).  Substantial gainful activity is work activity that involves doing significant physical or mental activities and is usually done for pay or profit.  *Id*. §§ 404.1572(a) & (b).  If the claimant is engaging in such activity, then the inquiry ends because the claimant is not disabled.

"The [Step Two] inquiry is a de minimis screening device to dispose of groundless claims." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003).  At this step, the ALJ decides whether the claimant has an impairment or a combination of such impairments that is severe.  20 C.F.R. § 404.1520(c).  An impairment or combination of impairments is severe if it significantly limits a claimant's ability to perform basic work activities.  An impairment or combination of impairments is not severe if the claimant has a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations.  *Id*. § 404.1522.  If the claimant does not have a severe impairment or combination of impairments, then the inquiry ends because the claimant is not disabled.

At Step Three, the ALJ decides whether the claimant's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment(s) in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1.  20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.  If the claimant's specific impairment is not listed, the ALJ

will consider the most closely analogous listed impairment for purposes of deciding medical equivalence.  *Id*. § 404.1526(b)(2).  If the claimant has an impairment or combination of impairments that meets or medically equals a Listing, then the claimant is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months.  *Id*. § 404.1509.

At Step Four, the ALJ must determine the claimant's residual functional capacity ("RFC"), determine the physical and mental demands of the claimant's past relevant work, and determine whether claimant has the level of capability needed to perform past relevant work.  20 C.F.R. §§ 404.1520(e) & (f).  RFC is the claimant's maximum remaining ability to do physical and mental work activities on a sustained basis despite limitations from his impairments.  Past relevant work is work performed (either as the claimant actually performed it or as it is generally performed in the national economy) either within the last 15 years or within 15 years prior to the disability date. In addition, the work must have lasted long enough for the claimant to learn to do the job and be engaged in substantial gainful activity.  *Id*. §§ 404.1560, 404.1565.  If the claimant's RFC enables her/him to perform past relevant work, then the claimant is not disabled.

At Step Five, the ALJ must decide whether the claimant, considering her/his RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy.  20 C.F.R. § 404.1520(g).  If the claimant is incapable of doing so, then s/he is presumed to be disabled if her/his impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

In deciding the claimant's ability to perform other jobs that exist in significant numbers in the national economy, the ALJ must consider whether the claimant's impairment and symptoms result in exertional and/or non-exertional limitations.   The classification of a limitation as

8

exertional is related to the United States Department of Labor's classification of jobs by various exertion levels (sedentary, light, medium, heavy, and very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling.  20 C.F.R. §§ 404.1569a(a) & (b).  Non-exertional limitations affect a claimant's ability to meet all other demands of a job (i.e., non-strength demands), including but not limited to difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching.  *Id*. § 404.1569a(c).

If the claimant has no non-exertional limitations and can perform all or substantially all exertion demands at a given level, then the ALJ must use the Medical-Vocational Rules (also referred to as "Grid Rules") found at 20 C.F.R. § 404, Subpart P, Appendix 2.  20 C.F.R. § 404.1569a(b).  The Grid Rules reflect various combinations of RFC, age, education, and work experience and direct a finding of disabled or not disabled for each combination.  If the claimant also has any non-exertional limitations or cannot perform substantially all the exertional demands at a given level, then the Grid Rules are used as a framework for decision-making unless there is a rule that directs a conclusion of disabled without considering the additional non-exertional or exertional limitations.  *Id*. § 404.1569a(d).  If the claimant has solely non-exertional limitations, then the Grid Rules provide a framework for decision-making.  *Id*. § 404.1569a(c).

## III.    ALJ DECISION AND APPELLATE ISSUES

Plaintiff was forty-six years old on his alleged onset date (October 1, 2012), and his date last insured was June 30, 2015.  (R. 16, 23.)  At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the period between his alleged onset date and his date last insured.  (R. 16.)  At Step Two, the ALJ found that Plaintiff had the following severe impairments through his date last insured:  spine disorders and an affective disorder.  Also at Step

Two, the ALJ found that Plaintiff had the following impairments that were not severe: hyperlipidemia and migraines. (R. 16.)  At Step Three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that were severe enough to meet or medically equal the severity of any Listing. (R. 17-18.)  At Step Four, the ALJ found that Plaintiff had the residual functional capacity to perform sedentary work, subject to various exertional and non-exertional limitations.  Also at Step Four, the ALJ found that Plaintiff was unable to perform any past relevant work – maintenance engineer, janitor, real estate appraiser, and customer service representative. (R. 18-23.)  At Step Five, the ALJ found that a finding of not disabled would be directed by Grid Rule 201.21 if Plaintiff had the RFC to perform the full range of sedentary work.  Also at Step Five, the ALJ found based on VE testimony that Plaintiff was not disabled because he could have performed the following jobs that existed in significant numbers in the national economy – addresser, order clerk, and document preparer.  (R. 23-24.)

Plaintiff contends that reversal is warranted for four reasons.  First, Plaintiff argues that the ALJ erred by failing to discuss and evaluate Plaintiff's weight at any point in the sequential inquiry. *See* ECF No. 12 at 19-24.  Second, Plaintiff argues that the ALJ erred at Step Three by not finding that the combination of Plaintiff's impairments "is the medical equivalent of the Commissioner's Listings." *Id*. at 35-40.  Third, Plaintiff argues that the ALJ erred at Step Four because the RFC is not supported by substantial evidence. *See id*. at 24-31.  Fourth, Plaintiff argues that the ALJ erred at Step Five because the hypotheticals presented to the VE did not include all of Plaintiff's credibly established limitations and because the VE's testimony was inconsistent with the DOT.  (R. 31-35.)[5]  Plaintiff seeks a remand for payment of benefits or alternatively a new hearing.  Defendant

---

[5] Plaintiff complains in the Summary of Argument section of his brief that his "migraine headaches are neither acknowledged as a severe impairment not labeled as not severe."  ECF No. 12 at 12 ("But are these migraines 'severe impairments' or not?  We never find out.").  Plaintiff is wrong; the ALJ expressly found

contends that the ALJ's decision should be affirmed in its entirety because it correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence. *See* ECF No. 13 at 12-21.

## IV.    SUMMARY OF EVIDENCE

### A.    <u>Treating Providers.</u>

#### 1.    **Physical Impairments.**

In November 2013, Plaintiff was seen for "follow-up" by Dr. Vinod Abraham (internal medicine) from Associates In Integrated Medicine.[6]  Dr. Abraham reported that Plaintiff "seems to be doing better overall" since starting antidepressant therapy but that he continues to experience back pain that was helped "slightly" by Tramadol and "with modest benefit" from non-pharmacological therapies.  Dr. Abraham noted among Plaintiff's vital signs a BMI of 38.74.  Dr. Abraham increased Plaintiff's Tramadol dosage, additionally prescribed Cyclobenzaprine, and continued Plaintiff's Wellbutrin dosage.  Lab reports dated November 26, 2013 reflected slightly elevated glucose, cholesterol, and triglycerides levels.  (R. 273-77.)

In May 2014, Plaintiff was seen by Dr. Abraham to review lab results and to evaluate daily, diffuse headaches that lasted hours and were associated with photophobia.  Plaintiff denied dizziness, gait abnormality, head injury, paresthesia, speech abnormality, or tremor.  Dr. Abraham noted among Plaintiff's vital signs a BMI of 38.74.  Dr. Abraham diagnosed radiculopathy,

---

at Step Two that both Plaintiff's hyperlipidemia and migraines were "'non-severe' as defined in the Regulations" because he failed to establish that these impairments "imposed more than a slight vocational limitation" on his ability to perform work related activities.  (R. 16.)  Moreover, even if the ALJ had erroneously concluded that Plaintiff's migraines were non-severe, any such error was harmless because the ALJ nevertheless found in Plaintiff's favor at Step Two.  *See Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 n.2 (3d Cir. 2007); *see Rivera v. Comm'r of Soc. Sec.*, 164 F. App'x 260, 261 n.2 (3d Cir. 2006) (same); *Ross v. Astrue*, No. 08-cv-5282 (SDW), 2010 WL 777398, at *5 (D.N.J. Mar. 8, 2010) (same).

[6] There are no earlier files in the record from Dr. Abraham or Associates In Integrated Medicine.

"migraine, unspecified, without mention of intractable migraine," and hyperlipidemia.   He continued Plaintiff's Tramadol and Cyclobenzaprine prescriptions, additionally prescribed Maxalt, and recommended dietary changes.  (R. 271-72.)

### 2.    Mental Impairments.

In March 2013, Plaintiff was seen for an initial evaluation by Dr. Harish K. Malhotra (psychiatrist) from Partners In Psychiatry.  Plaintiff stated that he could no longer work, had a declining bank account balance, was not taking any psychotropic medications, and was not receiving any mental health treatment.  Dr. Malhotra observed that Plaintiff was 5'11" in height, weighed 272 pounds, and walked with a normal gait.  Although Plaintiff appeared anxious and depressed and was preoccupied by his health, he was well groomed, cooperative, and attentive; maintained good eye contact and was easy to approach; had normal speech and an appropriate affect; had goal-directed thought process and reality-based perceptions; and had normal memory, judgment, insight, concentration, and intelligence.  Dr. Malhotra diagnosed a dysthymic reaction and recommended that Plaintiff walk 15 minutes twice daily; decrease his cigarette smoking and alcohol consumption; engage in individual psychotherapy and medication management; and seek assistance from the Office of Vocational Rehabilitation.  (R. 248-61.)

Plaintiff was treated by Dr. Malhotra again in 2013 on six occasions.  In April, Dr. Malhotra reported that Plaintiff had a depressed mood and appeared tense, but his mental status showed an appropriate affect, normal speech, and reality-based thought content.   Dr. Malhotra again recommended reduced cigarette smoking and alcohol consumption.  In June, Dr. Malhotra noted that Plaintiff had a normal gait but appeared tense.  In July, Plaintiff reported that he was taking Trazodone for sleep.  Although Plaintiff had an anxious mood and a constricted affect, the remainder of the mental status examination was within normal limits.  Dr. Malhotra recommended

psychotherapy sessions.  In August, Dr. Malhotra prescribed Wellbutrin.  In November, Plaintiff had  decreased the number of cigarettes he smoked per day and was walking and staying occupied doing volunteer work.  Dr. Malhotra made no medication adjustments.  In December 2013, Plaintiff reported family difficulties.  Dr. Malhotra recommended psychotherapy and asked Plaintiff to continue taking Wellbutrin and Trazodone.  (R. 237-47, 297-300.)

Plaintiff was treated by Dr. Malhotra in 2014 on six occasions.  In February, Dr. Malhotra noted Plaintiff's complaints of increased pain in his wrist, elbow, shoulder, and knees "due to excessive exercise," but also stated he was "okay."  Plaintiff had a normal gait and a relaxed posture.  Dr. Malhotra recommended psychotherapy and that Plaintiff continue taking Wellbutrin. In April, Plaintiff again complained of chronic pain.  Dr. Malhotra recommended that Plaintiff walk each day.  In June, Plaintiff was "doing well."  He had started daily walking and further reported he had "decided not to work."  Dr. Malhotra made no medication or treatment adjustments.  In July, Dr. Malhotra continued Plaintiff's medications.  In September, Plaintiff was "feeling okay" and continued his daily walking but reported back spasms.  Dr. Malhotra continued Plaintiff's medications.  In December, Plaintiff complained about muscle spasms.  (R. 285-96.)

Plaintiff was treated by Dr. Malhotra twice in 2015 prior to the hearing.  In January, Plaintiff had "nothing special" to report.  He had been going out when he could and watching television. Dr. Malhotra made no medication adjustments.  In March, Plaintiff felt depressed due to a "postponement."  Dr. Malhotra asked Plaintiff to continue his medications.  (R. 281-84.)

**B.    Non-Treating Providers.**

In April 2013, Dr. Rashel Potashnik (physical medicine and rehabilitation specialist) performed an orthopedic consultative examination.  Dr. Potashnik noted Plaintiff's prior surgical

history and current complaints of persistent back pain and weakness, in addition to Plaintiff's self-reported depression and anxiety, for which he was under psychiatric care. Plaintiff stated that he was taking Tramadol 3 times per day, and 2 to 3 Ibuprofen or Tylenol tablets about 3 to 4 days per week. Dr. Potashnik observed Plaintiff enter the office without an assistive device and at a normal pace; independently dress and mount the examination table; and walk on his tiptoes and stand on his heels. Plaintiff appeared depressed and said he could not squat. His cervical spine revealed no significant tenderness, and he had functional range of motion in all planes. His lumbar spine revealed a midline scar, generalized tenderness to palpation, a positive Patrick's test bilaterally, and a negative straight-leg raising test bilaterally. His left shoulder had mild diffuse tenderness to palpation, but the remainder of the upper extremity examination revealed normal range of motion, normal strength, normal sensation, and normal deep tendon reflexes. His lower extremities revealed right knee tenderness to palpation of the medial joint line and medial patellofemoral line and slightly decreased strength proximally, with complaints of lower back pain. The remainder of the examination was normal. Dr. Potashnik ordered lumbosacral x-rays that showed post-operative changes with satisfactory alignment. Dr. Potashnik's impression was that Plaintiff had a history of lumbar fusion and presented with chronic pain that may limit activities requiring heavy lifting and repetitive bending. (R. 228-32.)

In January 2014, Dr. David Gelber (psychologist) performed a mental status consultative examination. Plaintiff drove himself to the appointment, but Dr. Gelber observed that Plaintiff stood, walked, and sat slowly with discomfort, apparently due to low back pain. Dr. Gelber further observed that Plaintiff had good hygiene and was casually dressed and adequately groomed. Plaintiff's chief complaints were physical health problems with chronic pain, and depressive symptoms such as trouble concentrating and finishing tasks. Plaintiff stated that he approached a

psychiatrist about a year ago on advice of counsel after his initial application was denied. Plaintiff's medications included Trazodone for sleep and Aplenzin for depression. He rarely used Trazodone despite it helping him sleep because of medication side effects the next day. Plaintiff described his work history, noting he was terminated from his job in September 2010 while he was out on disability following his spinal surgery. He received unemployment benefits until a year and a half earlier, and thereafter unsuccessfully sought employment. Plaintiff then filed for disability "based on his continued back problems." He said it was hard to sit or stand for any length of time, and that walking, traveling, using the bathroom, bathing, and doing chores all caused back pain. Dr. Gelber administered the WAIS-IV, the results of which placed Plaintiff in the average to low average range of intellectual functioning with moderate concentration and memory deficits. On mental status examination, Plaintiff had a moderately depressed mood, but there were no abnormalities of thought content; no hallucinations, delusions, or other aberrant thought patterns elicited or reported; and no paranoid ideations. His speech was within the normal range, appropriate to context, and unremarkable. His psychomotor activity level was normal, and he sat "easily" throughout the 45-minute evaluation. Plaintiff was well oriented, and he correctly identified the current and past Presidents. He was not tearful during the evaluation and had a normal range of affect. He reported disturbed sleep patterns and had lost about 10 pounds over the past year. Plaintiff's anxiety was limited to financial worries, and he denied generalized anxiety and panic symptoms. Plaintiff appeared to have good insight and mildly impaired judgment. Plaintiff described his day as waking up between 2:00 and 3:00 p.m., using the restroom, drinking coffee and smoking cigarettes, watching television, eating a meal, perusing the internet, watching sports on television, and drinking beer and soda. He drove independently; did not use public transportation; did chores such as shopping, laundry, and dishes; used a computer;

and sometimes read magazines.  Plaintiff lived with his girlfriend and maintained regular contact with his brother, sister-in-law, and niece.  He denied having friends or a peer group, and he denied participating in any group social or religious activities.  Dr. Gelber diagnosed an adjustment disorder not otherwise specified, rule out polysubstance abuse.  (R. 262-65.)

In February 2014, Dr. Potashnik performed a second orthopedic consultative examination. Plaintiff complained of low back pain and diminished strength in his legs and back, but his gait was normal without an assistive device.  Dr. Potashnik observed that Plaintiff was "moaning and groaning throughout the entire examination."  Plaintiff independently dressed and got on and off the examination table, could squat halfway while holding onto the examination table, and walked on his tiptoes and heels.  Although Plaintiff reported generalized cervical spine tenderness and generalized pain to lumbar spine palpation, he had functional range of motion in all planes and no palpable spasms.  He further reported low back pain while performing the straight-leg raising test, but the test was negative bilaterally.  Although Plaintiff reported soreness to light palpation of his upper and lower extremities, he had normal range of motion, normal 5/5 strength, and normal sensation.  Dr. Potashnik's impression was a history of a lumbar fusion with chronic pain and subjective weakness.  (R. 266-69.)

### C.    Non-Examining Providers.

In May 2013, State Agency reviewing consultant Dr. David Schneider opined that Plaintiff retained the capacity for light work; could stand, walk, or sit for six hours in an eight-hour workday; could occasionally lift/carry up to twenty pounds; and could frequently lift/carry up to ten pounds.  Dr. Schneider did not recommend any postural, manipulative, environmental, communicative, or visual limitations.  (R. 75-77.)

In January 2014, State Agency reviewing consultant Dr. Michael D'Adamo opined that Plaintiff had an affective disorder. In rating the severity of the disorder, Dr. D'Adamo found Plaintiff had moderate restriction in daily activities and in maintaining concentration, persistence, or pace; mild restriction in maintaining social functioning; and no episodes of decompensation. Dr. D'Adamo then assessed Plaintiff's RFC and found that Plaintiff had some limitations in stress tolerance and concentration mostly due to pain but preserved the ability to adapt and be productive in jobs where the production demands were modest. (R. 86-87.)

In February 2014, State Agency reviewing consultant Dr. Arthur Pirone affirmed Dr. Schneider's opinion that Plaintiff retained the capacity for light work; could stand, walk, or sit for six hours in an eight-hour workday; could occasionally lift/carry up to twenty pounds; and could frequently lift/carry up to ten pounds. Dr. Pirone similarly did not recommend any postural, manipulative, environmental, communicative, or visual limitations. (R. 85-88.)

### D. **Plaintiff's Reports And Testimony.**

In December 2013, Plaintiff completed a Function Report indicating that he lived in an apartment with family. His activities included using the computer and watching television. He could make himself simple meals on a daily basis, pick up after himself, wash dishes, drive a car, and shop in stores for groceries as needed.

The ALJ accurately summarized Plaintiff's September 2015 hearing testimony as follows:

[T]he claimant testified that he smokes and drinks alcohol. He smoked marijuana in the past. He is divorced and lives alone in an apartment on the second floor. He last worked in March 2010, when he had surgery on his back. Mr. Digiulio testified that he applied for work since then, but was not hired. He is currently living off his savings and food stamps. The claimant related that he was an engineer at a hotel, where he lifted 5 pounds, stood and walked 2-3 hours during an eight-hour day and supervised one employee. He also worked as a housekeeper, where he mopped the floor, picked up garbage and lifted up to 10 pounds. From 2002 to 2005, he was a real estate appraiser. He first developed back problems in 1993 or 1994 and had surgery in 1995 and 2010, followed by six months of rehabilitation. The claimant

related that he feels that his back pain is worse now. His pain is constant, starts in his back, and radiates into his legs. He has to change positions due to pain every 15-20 minutes; he can walk one block with pain; and he can lift a gallon of milk with no problem. He has used a cane since 2010. He takes Tramadol and Advil, which affects his concentration and he takes Trazadone to help him sleep. He last saw his surgeon 1 year after his surgery and had no treatment since that time, except for treatment by his general practitioner that ended six months ago. The claimant testified that he sees a psychiatrist for depression, restlessness and confusion.

When asked about his activities of daily living, the claimant related that he has a friend who shops and does some of the household chores. He can bathe himself; cook sometime; watch television, although distracted by pain; go out of the house 1-2 times a week; and socialize about once a week. He feels that he could not sit for 6-8 hours because he would be in agony, and he cannot hold a job due to pain, depression and anxiety.

(R. 20-21.) Plaintiff also testified that Tramadol and Advil did not fully resolve his back pain but "took the edge off" it, and that he experienced a week-long migraine headache approximately three times per year. (R. 48, 60.)

## V.    DISCUSSION

### A.    __Obesity Analysis.__

Plaintiff correctly asserts that since obesity is no longer a listed impairment, the ALJ must "consider [obesity's] effects when evaluating disability" and recognize at each step of the sequential inquiry that "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." Social Security Ruling 02-1p, *Titles II & XVI: Evaluation of Obesity*, 2002 WL 34686281, at *1 (S.S.A. Sep. 12, 2002) ("obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing"). Plaintiff argues that the ALJ erred at Step Two by failing to find obesity as a severe or not severe impairment; at Step Three by failing to combine obesity with Plaintiff's other impairments; and at Steps Four and Five by failing to factor obesity into Plaintiff's RFC.

The Court rejects Plaintiff's argument for the same reasons that the Third Circuit rejected the identical argument in *Rutherford v. Barnhart*, 399 F.3d 546 (3d Cir. 2005):

> *Skarbek v. Barnhart*, 390 F.3d 500 (7th Cir. 2004) (per curiam) has recently considered the precise argument that Rutherford now asserts. In rejecting the notion "that the ALJ's failure to mention his obesity is reason enough to remand the case" (*id*. at 504), the Seventh Circuit articulated an analysis that might well have been written for this case (*id*.) (citations omitted):
>
>> An ALJ is required to consider impairments a claimant says he has, or about which the ALJ receives evidence. Although [claimant] did not specifically claim obesity as an impairment (either in his disability application or at his hearing), the references to his weight in his medical records were likely sufficient to alert the ALJ to the impairment. Despite this, any remand for explicit consideration of [Plaintiff's] obesity would not affect the outcome of this case. Notably, [Plaintiff] does not specify how his obesity further impaired his ability to work, but speculates merely that his weight makes it more difficult to stand and walk. Additionally, the ALJ adopted the limitations suggested by the specialists and reviewing doctors, who were aware of [Plaintiff's] obesity. Thus, although the ALJ did not explicitly consider [Plaintiff's] obesity, it was factored indirectly into the ALJ's decision as part of the doctors' opinions.
>
> We follow the Seventh Circuit and conclude that a remand is not required here because it would not affect the outcome of the case. Rutherford never mentioned obesity as a condition that contributed to her inability to work, even when asked directly by the ALJ to describe her impairments. So even if we assume—in accordance with common sense—that the administrative record's evidence of Rutherford's 5'2" height and her weight of some 245 pounds sufficed to alert the ALJ that obesity could be a factor, Rutherford has not specified how that factor would affect the five-step analysis undertaken by the ALJ, beyond an assertion that her weight makes it more difficult for her to stand, walk and manipulate her hands and fingers. That generalized response is not enough to require a remand, particularly when the administrative record indicates clearly that the ALJ relied on the voluminous medical evidence as a basis for his findings regarding her limitations and impairments. Because her doctors must also be viewed as aware of Rutherford's obvious obesity, we find that the ALJ's adoption of their conclusions constitutes a satisfactory if indirect consideration of that condition.

*Rutherford*, 399 F.3d at 552-53 (citations omitted). Here, as in *Rutherford*:

- Plaintiff did not claim any obesity as an impairment in his DIB application.

- Plaintiff did not claim obesity as an impairment in his hearing testimony.

- Plaintiff's counsel never asserted obesity as an impairment before the ALJ or Appeals Council.

- References to Plaintiff's weight in his medical records were sufficient to alert the ALJ to the potential impairment.  (R. 228, 254, 267, 271.)

- No medical provider ever diagnosed Plaintiff with obesity.  In fact, Dr. Gelber characterized Plaintiff merely as "somewhat above average weight."  (R. 262.)

- No medical provider "mentions obesity as contributing to any limitation." *Rutherford*, 399 F.3d at 553.

- Plaintiff offers no specificity as to how his obesity allegedly impaired his ability to work.  Instead, he summarily states that "[t]here is no factual doubt that [P]laintiff's BMI of 39 has persisted throughout the period and undoubtedly presents a number of work-related restrictions, particularly in conjunction with his disc disease, fused lower back, lumbar radiculopathy and depression."  ECF No. 12 at 23.

Plaintiff makes no effort to distinguish this case notwithstanding his decision to rely on *Rutherford* elsewhere in his brief.  *See* ECF No. 12 at 31-32.  The Court therefore finds that reversal is not warranted because any error by the ALJ regarding Plaintiff's weight was harmless.

## B.   Step Three.

The ALJ found at Step Three that the severity of Plaintiff's impairments, considered singly and in combination, did not meet or medically equal the criteria of any Listing.  (R. 17.)  In making this finding, the ALJ expressly considered Listings 1.04 (Disorders of the Spine) and 12.04 (Affective Disorders).[7]  As best the Court can discern from Plaintiff's mostly unintelligible briefing, he argues that:  (1) he meets Listing 1.04; (2) he meets Listing 12.04; and (3) the ALJ failed to combine Plaintiff's impairments for an assessment of medical equivalence.

---

[7] The Court analyzes all Listing criteria, as did the ALJ, as of October 28, 2015, the date of the ALJ's decision.  The applicable criteria are described in Social Security Administration Program Operations Manual System ("POMS") DI 34121.011, *Musculoskeletal Listings from 06/16/2008 to 09/28/2016*, available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0434121011, and POMS DI 34132.009, *Mental Listings from 12/18/07 to 09/28/16*, available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0434132009.

### 1.    Listing 1.04.

Listing 1.04 provides:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.  With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> OR
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
>
> OR
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in an inability to ambulate effectively, as defined in 1.00 B2b.

POMS DI 34121.011, Listing 1.04; *see id*., Listing 1.00 B2b ("Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.").

The ALJ found that "[w]ith respect to the claimant's spinal impairments, the requirements of [L]isting 1.04 have not been met because the evidence fails to demonstrate the existence of a 'herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis,' or the requirements of A, B, or C of this [L]isting."  (R. 17.)  Plaintiff argues that he satisfies Listing 1.04 because he underwent surgery in 1996 and 2010 for herniated

nucleus pulposus and degenerative disc disease. He also argues that he satisfies Paragraph A because he was diagnosed with lumbar radiculopathy which, Plaintiff asserts, "*is* nerve root compression." ECF No. 12 at 13 (emphasis in original); *see id.* at 14 ("If the evidence fails to demonstrate herniated discs or degenerative disc disease, why were [P]laintiff's discs removed and replaced by cement, plates and screws? If [P]laintiff doesn't suffer degenerative disc disease, what is causing his lumbar radiculopathy? What is pressing on his lumbar nerve routes? Why is [P]laintiff in chronic pain?").

The Court rejects Plaintiff's argument. The fact that Plaintiff may have had surgeries to correct herniated discs or degenerative disc disease in the past is not evidence that Plaintiff continues to have those conditions. For example, the April 2013 lumbar spine x-ray report on which Plaintiff relies indicates that he is "status-post anterior and posterior spinal fusion at the L3-L4, L4-L5, and L5-S1 discs. The vertebral bodies appear of normal height. There is satisfactory alignment noted in neutral position." (R. 232.) Moreover, even if diagnostic imaging indicated that Plaintiff currently had the requisite conditions, Plaintiff points to no evidence that he satisfies all the Paragraph A criteria. To the contrary, the record medical evidence demonstrates that Plaintiff had normal range of motion, normal strength, normal sensation, and a negative bilateral straight-leg raising test. The Court therefore finds that substantial evidence supported the ALJ's finding that Plaintiff did not meet Listing 1.04.

## 2. Listing 12.04.

Listing 12.04 is met when the criteria of both Paragraph A and Paragraph B are satisfied, or when the criteria of only paragraph C are satisfied. The ALJ found that Plaintiff did not satisfy the Paragraph B criteria because he had moderate restrictions as to daily living activities; mild difficulties as to social functioning; moderate difficulties as to concentration, persistence, and

pace; and no episodes of decompensation. (R. 17-18.)[8]  The ALJ "also considered whether the '[P]aragraph C' criteria were satisfied" and found that "the evidence fails to establish the presence of [these] criteria." (R. 18.)[9]  Plaintiff argues that the ALJ failed to provide sufficient explanation for these findings. ECF No. 12 at 39 ("Psychiatric disturbances produce only 'moderate restrictions' without explanation as to why they aren't 'marked restrictions' and therefore presumptively disabling.").

The Court rejects Plaintiff's argument. The ALJ specifically explained that the moderate limitation in daily living activity was based on Plaintiff's statements that he had difficulty putting on his pants and tying his shoes, and that he had a friend help him with household chores. (R. 17.) The ALJ also explained that mild limitation in social functioning was based on evidence indicating

---

[8] To satisfy the Paragraph B criteria, a claimant must demonstrate marked limitations in at least two of the three functional categories or a marked limitation in one category together with repeated episodes of decompensation, each of extended duration. POMS DI 34132.009. A marked limitation means more than moderate but less than extreme and "may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." *Id.*, Listing 12.00C (citing 20 C.F.R. § 404.1520a). As to decompensation, "repeated episodes" of "extended duration" means three episodes within one year, or an average of once every four months, each lasting for at least two weeks. *Id*.

[9] Paragraph C provides:

Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

POMS DI 34132.009. It was not necessary for the ALJ to analyze the Paragraph A criteria after finding that Plaintiff did not satisfy either Paragraph B or C. *See Holloman v. Comm'r of Soc. Sec.*, 639 F. App'x 810, 813-14 (3d Cir. 2016); *Nunez v. Comm'r of Soc. Sec.*, No. 2:14-cv-4664 (KM), 2015 WL 4770991, at *4 (D.N.J. Aug. 12, 2015).

"that the claimant has a girlfriend; that he is able [to] maintain regular contact with his brother, sister-in-law and niece; that he is able to go out alone; and that he has no problems getting along with family, friends, neighbors or authority figures." (*Id*.)  The ALJ further explained that the moderate limitation in concentration, persistence, or pace was based on Plaintiff's history of depression and findings during his consultative examination that "his intellectual functioning was estimated to be in the average to low range with moderate concentration and memory deficits." (*Id*.)  "It is not enough to simply call foul and punt to this Court by arguing without support or analysis that the ALJ did not adequately conduct the Step Three analysis." *Domkos v. Colvin*, No. 15-cv-2660 (JLL), 2016 WL 1732380, at *3 (D.N.J. May 2, 2016).  Plaintiff points to no conflicting evidence from which this Court can conclude that he had marked limitations in any functional category, let alone in at least two.  Nor does Plaintiff point to evidence that he experienced any decompensation episodes; that even a minimal increase in mental demands or change in the environment would be predicted to cause him to decompensate; or that he has at least a one-year history of inability to function outside a highly supportive living arrangement. The Court therefore finds that substantial evidence supported the ALJ's finding that Plaintiff did not meet Listing 12.04.

### 3. Medical Equivalence.

Plaintiff complains that the ALJ failed to combine for a discussion of medical equivalence the "presented evidence of a fused lumbar spine at three levels along with radiculopathy, exogenous obesity, pain, limitation of motion, depression, concentration deficits and a significant reduction in his ability to perform basic activities of daily life."  ECF No. 12 at 39 (also complaining that ALJ failed to combine Plaintiff's migraines).  The Court rejects Plaintiff's conclusory argument that such "combination would have yielded a 'less-than-sedentary RFC,' a

24

medical equivalence with paragraph 1.04." *Id.* For the reasons explained above, the ALJ did not

err by failing to consider Plaintiff's weight. As to other impairments, Plaintiff does not "point to

any medical evidence ignored by the ALJ that would indicate that [his] impairments are equivalent

to one of the Listings the ALJ identified." *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 93 (3d Cir.

2007); *see Holloman v. Comm'r of Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016) (no basis for

remanding case even if portion of Step Three analysis was deficient where claimant complained

"in vague terms" without identifying "specific avenues for meeting or equaling specific listings

that the ALJ should have considered but did not"); *Cosby v. Comm'r of Soc. Sec.*, 231 F. App'x

140, 146 (3d Cir. 2007) (affirming Step Three determination where Plaintiff "does not point to any

medical evidence ignored by the ALJ that would show that [claimant's] impairments medically

equaled one of the [L]istings"). The Court therefore finds that the ALJ's Step Three findings were

supported by substantial evidence.

### D. Step Four: RFC.

At Step Four, the ALJ found:

[T]he claimant had the residual functional capacity to perform sedentary work as
defined in 20 CFR 404.1567(a) with the ability to understand, remember and carry
out simple instructions with only occasional changes to essential job functions; sit
for six hours with the ability to stand for 1-5 minutes after 30 minutes of sitting;
stand and walk for two hours with the ability to sit for 1-5 minutes after standing
and walking for 30 minutes; with frequent stooping, kneeling, crouching and
crawling.

(R. 18.) Plaintiff contends that this RFC finding was not supported by substantial evidence

because it "contain[ed] elements presumably snatched out of thin air without bothering to connect

the evidence to any evidentiary element, theme or entry." ECF No. 12 at 15; *see id.* at 27 ("here

the ALJ succumbed to the temptation of 'playing doctor'"). This harsh criticism is simply not true

and completely inappropriate, because the ALJ's finding was based on a thorough review of the evidence. (R. 18-22.)

As to Plaintiff's physical impairments, he underwent back surgery in 1995 and again in 2010. He was released back to work six months after his second surgery. Since then, he has not seen his surgeon or any orthopedic specialist. Treating source evidence consists of two appointments with his primary care physician, Dr. Abraham. In November 2013, Plaintiff stated that he continued to experience back pain that was slightly helped by Tramadol. Dr. Abraham increased Plaintiff's Tramadol dosage, additionally prescribed Cyclobenzaprine, and advised Plaintiff to follow-up on an as-needed basis. In May 2014, Plaintiff saw Dr. Abraham for complaints about headaches associated with photophobia. Dr. Abraham diagnosed radiculopathy and "migraine, unspecified, without mention of intractable migraine." He added Maxalt to Plaintiff's prescription medications. Dr. Potashnik's two orthopedic consultative examinations reflected that Plaintiff walked with a normal unassisted gait, was independent with dressing and transferring on/off the examining table, and had full range of motion and no evidence of strength, sensory, or motor deficits. Plaintiff did exhibit some tenderness upon palpation of the lumbar spine. Spinal x-rays documented Plaintiff's post-operative condition with satisfactory alignment. Dr. Potashnik opined that Plaintiff could be limited in activities that required heavy lifting and repetitive bending. The State Agency reviewing consultant opined that Plaintiff was able to perform light work.

As to Plaintiff's mental impairments, he did not seek any treatment until March 2013 after his disability benefits application was denied. Dr. Malhotra's 18 months of treatment notes indicated that Plaintiff's significant complaints related to pain from his physical impairments. By the end of 2013, Plaintiff was doing well emotionally on his medication regimen of Wellbutrin.

Dr. Gelder's mental status consultative examination reflects that Plaintiff's chief complaint involved his physical impairments with subsequent current depressive systems. Although Dr. Gelder opined that Plaintiff had evidence of depression, the examination was essentially benign. Dr. Gelder further opined that Plaintiff's overall intellectual functioning was in the average to low average range. The State Agency reviewing consultant opined that Plaintiff had moderate limitations with daily living activities and concentration, persistence, and pace but preserved the ability to adapt and be productive in jobs where the production demands were modest.

Plaintiff does not point to any conflicting evidence ignored by the ALJ in crafting the RFC finding. As an accommodation, the ALJ found that Plaintiff was able to perform sedentary work with the option of changing positions every thirty minutes for between one and five minutes at a time. This option did not constitute the ALJ's lay medical opinion. *See Green v. Colvin*, No. 9:14-cv-2195 (BHH), 2015 WL 5602623, at *3-4 (D.S.C. Sep. 23, 2015) (rejecting argument that RFC finding lacked substantial evidence because ALJ failed to explain how a sit/stand option would accommodate pain associated with degenerative disc disease). The ALJ was not required to credit the VE's testimony that an additional unscheduled fifteen-minute break and more than one absence per month would preclude all employment if the ALJ found that such limitations were not supported by the record. The ALJ also included a limitation for simple instructions and occasional changes in essential job functions to accommodate Plaintiff's decreased stress tolerance and concentration due to pain. The ALJ specifically explained his reasons for finding that Plaintiff's subjective pain symptoms were inconsistent with the medical and non-medical evidence. (R. 21-22.)

The Court therefore finds that reversal is not warranted because the RFC finding was supported by substantial evidence.

**E.**    **Step Five.**

Plaintiff contends that the ALJ erred at Step Five because the hypotheticals presented to the VE did not include all of Plaintiff's credibly established limitations and because the VE's testimony conflicted with the DOT.[10]   The Court is not persuaded that either contention warrants reversal.

**1.**    **VE Hypotheticals.**

Plaintiff contends that the hypothetical questions posed to the VE by the ALJ were not supported by substantial evidence.  Specifically, Plaintiff argues:

> It cannot be ignored that here the ALJ's vague construction limiting the plaintiff to "simple instructions" and "occasional changes" does not come close to adequately conveying "moderate difficulties in performing activities of daily living" or other "moderate difficulties" in concentration, persistence, keeping pace, keeping a schedule, etc.  Here, just as in *Ramirez*, the VE's answers to the ALJ's questions may surely have been different had the actual, specific limitations, uncontradicted in the record, been conveyed verbatim as part of the ALJ's hypothetical.

*Id.* at 34 (citing *Ramirez v. Barnhart*, 372 F.3d 546 (3d Cir. 2004)).  Plaintiff's reliance on *Ramirez* is misplaced.

Mental limitation findings at Step Three assess whether the claimant is disabled because s/he met or equaled any Listing.  The Third Circuit held in *Ramirez* that, although such findings "are not an RFC assessment and that [S]tep [F]our requires a more detailed assessment, it does not follow that the findings [at Step Three] play no role in [S]teps [F]our and [F]ive, and SSR 96-8p, contains no such prohibition."  372 F.3d at 555 (citing Social Security Ruling 96-8p, *Policy

---

[10] Plaintiff's brief discusses the ALJ's Step Five analysis in an argument section entitled, "The RFC Assessment Is Not Based On Substantial Evidence."  ECF No. 11 at 23-34.  This section is unwieldy, and it is unclear whether Plaintiff asserts that the hypothetical questions failed in other ways to convey Plaintiff's credibly established limitations.  The Court finds that any such assertion merely would restate arguments regarding the ALJ's RFC determination at Step Four.  Since the Court found above that the RFC determination was not flawed, no further review is required.  *See, e.g.*, *See Rutherford v. Barnhart*, 399 F.3d 546, 554 n.8 (3d Cir. 2005); *Moss v. Comm'r of Soc. Sec.*, No. 13-cv-3365 (JLL), 2014 WL 3673042, at *9 (D.N.J. Jul. 22, 2014).

*Interpretation Ruling Titles II & XVI: Assessing Residual Functional Capacity In Initial Claims*, 1996 WL 374184 (S.S.A. Jul. 2, 1996)).  The Third Circuit further held that a VE hypothetical restricting a claimant to work involving "simple one to two step tasks" did not adequately convey in that case the ALJ's finding at Step Three that the claimant "often" suffered from "deficiencies of concentration, persistence, or pace."  372 F.3d at 551, 554 (noting that SSA regulation required ALJ to rate claimant at Step Three on a five-point scale of never, seldom, often, frequent, and constant) (citation omitted).  However, the applicable regulation changed after *Ramirez* was decided and now requires a rating on a five-point scale of none, mild, moderate, marked, and extreme.  Like the majority of courts in this District to have considered the issue, the Court is persuaded that this change in regulatory framework distinguishes *Ramirez*.[11]  Moreover, unlike the RFC finding at issue in *Ramirez*, the ALJ's RFC finding adequately conveyed Plaintiff's limitations as to both daily living activities (in that Plaintiff was limited to sedentary work with postural restrictions) and concentration, persistence, and pace (in that Plaintiff was limited to the ability to understand, remember and carry out simple instructions with only occasional changes to essential job functions).  As explained above, the record did not support additional limitations.

---

[11] *See*, *e.g.*, *Pimental v. Colvin*, No. 15-cv-2662 (JLL), 2016 WL 3456919, at *12 (D.N.J. June 21, 2016) (restriction to "simple, routine tasks adequately accounts for moderate limitations in concentration, persistence, or pace"); *Thompson v. Comm'r of Soc. Sec.*, No. 15-cv-2031 (RBK), 2016 WL 2978610, at *5 (D.N.J. May 23, 2016) (restriction to "simple, routine tasks with simple instructions" adequately accounted for "moderate difficulties with concentration, persistence or pace"); *Pidgeon v. Colvin*, No. 15-cv-2897 (JBS), 2016 WL 2647666, at *13 (D.N.J. May 9, 2016) (restriction to "routine and repetitive tasks" adequately accounted for moderate difficulties with concentration, persistence, or pace); *Domkos v. Colvin*, No. 15-cv-2660 (JLL), 2016 WL 1732380, at *9 (D.N.J. May 2, 2016) (restriction to "simple routine tasks" adequately accounted for moderate difficulties in concentration, persistence or pace) (all citing *McDonald v. Astrue*, 293 F. App'x 941, 946 (3d Cir. 2008) (restriction to "simple, routine tasks" adequately accounted for moderate difficulties with concentration, persistence and pace)).  *But see Boyle v. Colvin*, No. 12-cv-4724 (FLW), 2014 WL 3556507 (D.N.J. Jul. 18, 2014) (applying *Ramirez* to revised regulatory framework because *McDonald* is an unpublished decision).

The Court therefore finds that the hypothetical questions posed to the VE were supported by substantial evidence.

### 2.    VE Testimony.

Plaintiff contends that the ALJ committed reversible error by failing to resolve a conflict between the VE's testimony and the DOT.  Specifically, Plaintiff argues:

> [T]he decision's refusal to acknowledge the VE's own admission that her testimony was based on her own "experience" rather th[a]n information contained in the DOT led to the ALJ's demonstrably false assertion that such testimony was indeed consistent with the DOT.  The Commissioner's own explanatory rulings, binding on all ALJs require acknowledgement and resolution of such discrepancies[.]

ECF No. 12 at 34 (citing Social Security Ruling 00-4p, *Titles II & XVI: Use of Vocational Expert And Vocational Specialist Evidence, And Other Reliable Occupational Information In Disability Decisions*, 2000 WL 1898704, at *2 (S.S.A. Dec. 4, 2000)).  Plaintiff's reliance on Social Security 00-4p is misplaced.

The VE testified that a hypothetical claimant subject to the ALJ's RFC determination could perform the requirements of three representative occupations, each an unskilled position with an SVP of 2.  When questioned by the ALJ whether his testimony was consistent with the DOT, the VE responded:  "Yes, Your Honor, although the Dictionary of Occupational Titles doesn't speak specifically about the ability to change positions after 30 minutes or the ability to concentrate [f]or six out of eight hours, that's based on my experience."  (R. 66.)  The ALJ stated in the decision:  "Pursuant to SSR 00-4p, I have determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles."  (R. 24.)  Social Security Ruling 00-4p provides in relevant part:

> Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT.  When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS

> evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency. Neither the DOT nor the VE or VE evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by demonstrating if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information.

SSR 00-4p, 2000 WL 1898704, at *2. Simply put, there was no conflict for the ALJ to resolve because the DOT is silent as to the ability to change positions for the three jobs that the VE identified. *See Soto v. Comm'r of Soc. Sec.*, No. 17-cv-89 (KM), 2018 WL 355138, at *6 (D.N.J. Jan. 10, 2018) (ALJ "did not erroneously fail to inquire into an explicit conflict between the VE's testimony and the DOT" where DOT is silent as to sit/stand option); *accord Horn v. Colvin*, No. 12-cv-405 (CB), 2013 WL 1386836, at *4 (W.D. Pa. Apr. 4, 2013) (same); *Conn. v. Astrue*, 852 F. Supp.2d 517, 523 (D. Del. 2012) (same). The Court therefore finds the ALJ's reliance on the VE's testimony in this regard was supported by substantial evidence.

## V.    CONCLUSION

For these reasons, the Court affirms the Commissioner's decision that Plaintiff was not disabled as of his date last insured.


Dated: February 28, 2019                          s/ Paul A. Zoss
At Newark, New Jersey                        PAUL A. ZOSS, U.S.M.J.